# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

TAIR JONES,                                            Case No. 1:11-cv-228

      Plaintiff,                                Beckwith, J.
                                                       Bowman, M.J.
  v.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

      Defendant.


## REPORT AND RECOMMENDATION

Plaintiff Tair Jones filed this Social Security appeal in order to challenge the
Defendant's finding that she is not disabled.  *See* 42 U.S.C. § 405(g).  Proceeding
through counsel, Plaintiff present four claims of error.  As explained below, I conclude
that the finding of non-disability should be REVERSED, because it is based upon legal
error and is not supported by substantial evidence in the administrative record.

### I. Summary of Administrative Record

Plaintiff may have received SSI benefits as a child.[1]  (*See* Tr. 44-45, discussion
between counsel and ALJ regarding prior SSI record; *see also* Tr. 402, Plaintiff's report
to examiner that she had been on SSI, but was "cut off at 18.").  However, this case
concerns Plaintiff's application to receive Supplemental Security Income ("SSI") as an

---

[1] There is no presumption of continuing disability when a child attains the age of majority.  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286-287 n. 1 (6th Cir. 1994); *compare, generally, Drummond v. Commissioner of Social Security,* 126 F.3d 837, 842 (6th Cir.1997) (holding that when the Commissioner has made a final decision concerning an adult claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances'). Instead, the Social Security Act requires redetermination of SSI benefits within one year after an individual attains the age of 18, in which a claimant must generally submit medical or other evidence to show she is disabled under adult standards. *See Lewis v. Comm'r of Soc. Sec.* 2011 WL 334850 *6 (N.D. Ohio, Jan. 31, 2011).

1

adult, based upon an alleged mental disability beginning on February 26, 2001.[2]  (Tr. 148-150).  Plaintiff's primary complaint is her Bipolar and/or mood disorder.  After Plaintiff's October 26, 2007 application was denied initially and upon reconsideration, Plaintiff requested a hearing *de novo* before an Administrative Law Judge ("ALJ").

An evidentiary hearing was held on January 12, 2010 (Tr. 29-71),[3] at which Plaintiff appeared and testified, represented by counsel.  ALJ Deborah Smith also heard testimony from a vocational expert.  On February 9, 2010, ALJ Smith issued a written decision, concluding that Plaintiff was not disabled.  (Tr. 10-24).

The record reflects that Plaintiff was nineteen years old at the time of her application, and has never had any substantial gainful employment.  Plaintiff grew up in foster care, having been placed in that system at a young age due to her mother's drug abuse.  The longest Plaintiff lived with any foster parent was a period of two and a half years, but that she was removed from that home after a physical altercation with her foster mother.  (Tr. 41-43).  Plaintiff testified that she repeatedly ran away from her various foster placements until she was emancipated from the foster care system at the age of 18.  (Tr. 44).

She completed the equivalent of the tenth grade at a "behavioral program" known as the Life Skills Program, but her performance was below grade level in developmentally handicapped or severely behaviorally handicapped classes.  (Tr. 271, 275).  A report card dated June 2003, following completion of eighth grade, reflects

---

[2]As the Administrative Law Judge explained to Plaintiff at her hearing, SSI benefits may not be awarded retroactively for months prior to October 2007, the month in which the application was filed.  20 C.F.R. §415.335.  (*See also* Tr. 31).

[3]The evidentiary hearing was begun on December 15, 2009, but the ALJ continued the hearing because Plaintiff's counsel had submitted a number of records shortly before the hearing.  (Tr. 69-71).

promotion to ninth grade with C's earned in math, language arts, science and social studies from one teacher, and a "D-" earned in art class from a second teacher. (Tr. 358). However, a report card from the first two quarters of ninth grade reflects failing grades in all courses in both quarters. (Tr. 359). Plaintiff testified that after finishing the eighth grade, she briefly attended the Lighthouse Charter School, but did not graduate. (Tr. 35-36).

In the "Findings" representing the rationale of her decision, the ALJ determined that Plaintiff has not engaged in substantial gainful activity, and suffers from the following severe impairments: "mood disorder; borderline personality disorder; and borderline intellectual functioning." (Tr. 15). However, considering all of those impairments, the ALJ concluded that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." (Tr. 19). Instead, the ALJ determined that Plaintiff retains the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, subject only to the following nonexertional limitations:

> only simple, repetitive tasks; no more than superficial, minimal contact with others, including co-workers; requires gradual changes in routine; requires work in an isolated setting with infrequent contact with others; no direct contact with the general public.

(Tr. 20). Although the ALJ determined that Plaintiff had no past relevant work and a limited education, she found, based in part upon testimony from a vocational expert, that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." (Tr. 23). Thus, the ALJ concluded that Plaintiff was not under a disability and was not entitled to SSI benefits. (Tr. 24).

The Appeals Counsel denied Plaintiff's Request for Review on February 24, 2011, and Plaintiff subsequently filed a timely appeal with this Court. In her appeal, Plaintiff argues that the ALJ erred: (1) by improperly applying the "Treating Physician Rule"; (2) by relying only on evidence which fit her opinions, rather than considering all the evidence; (3) by failing to cite to portions of the record in support of her findings; and (4) by improperly assessing Plaintiff's credibility.

## II. Analysis

### A. Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability" within the definition of the Social Security Act. *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if

substantial evidence also exists in the record to support a finding of disability. *Felisky v.*

*Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. . .. The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted). In considering an application for supplemental security income or

disability benefits, the Social Security Agency is guided by the following sequential

benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing

substantial gainful activity; at Step 2, the Commissioner determines if one or more of the

claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the

claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of

Impairments; at Step 4, the Commissioner determines whether or not the claimant can

still perform his or her past relevant work; and finally, at Step 5, if it is established that

claimant can no longer perform his past relevant work, the burden of proof shifts to the

agency to determine whether a significant number of other jobs which the claimant can

perform exist in the national economy. *See Combs v. Commissioner of Soc. Sec.*, 459

F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

**B. Plaintiff's Assertions of Error**

**1. The Treating Physician Rule**

Plaintiff first argues that the ALJ erred by improperly applying what is known as

the "Treating Physician Rule." Applicable Social Security Regulations require the ALJ to

evaluate each medical opinion proffered, 20 C.F.R. § 404.1527(c), but generally give

more weight to the opinions of those who have personally examined the applicant than

the opinions of those who have not.  *Id.* at § 404.1527(c)(1).  A treating source's opinion will be given more weight because the medical professionals can "provide a detailed, longitudinal picture of [the] medical impairment," *id. at* § 404.1527(c)(2), and must be given "controlling" weight if the opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques," and "is not inconsistent with the other substantial evidence in [the] case record."  *Id.*  In determining how much weight to give to the opinions of a treating physician, the ALJ may consider the length and frequency of treating relationship, as well as the nature and extent of the treating relationship.  *Id.* at § 404.1527(c)(2)(i)-(ii).

### a.  Summary of Medical Evidence from All Sources

Although Plaintiff's mental health issues manifested themselves at a relatively young age, medical records, including but not limited to those from childhood, are sparse.  Born in 1988, Plaintiff entered foster care at the age of 5 or 6.  (Tr. 328).  Plaintiff appears to have been first evaluated for health services and diagnosed with adjustment disorder at age 6.  (Tr. 15, 354).  In January 2000 at the age of eleven, Plaintiff was briefly hospitalized for increasingly violent behavior towards others, and diagnosed with reactive attachment disorder, adjustment disorder with disturbance of conduct, oppositional defiant disorder, with a "rule out" of dysthymic disorder.  (Tr. 16, 348-349).

When she reached the age of 18 in 2006, Plaintiff apparently had a break in mental health treatment based upon a lack of health insurance and lack of information concerning free care.  (Tr. 43).  Mental health records reflect only emergency room visits, once for symptoms of a miscarriage, but primarily to obtain psychotropic medications, from 2006 through 2008.  (Tr. 367-396).

In January of 2008, shortly before her 20th birthday, the Plaintiff underwent a consultative mental health examination by Richard E. Sexton, Ph.D, at the request of the state Disability Determination Service. Dr. Sexton opined that Plaintiff had a full scale IQ of 73, with achievement tests demonstrating scores that reflect fifth through seventh grade equivalencies. (Tr. 274). Dr. Sexton diagnosed a mood disorder, not otherwise specified, borderline intellectual functioning, and a personality disorder, not otherwise specified. (Tr. 275). Non-examining consultant, Katherine Lewis, Psy.D, completed a psychiatric review technique form and rated Plaintiff's degree of functional limitations. (Tr. 293). Dr. Lewis concluded based upon Dr. Sexton's report that Plaintiff suffers from only mild limitations in her activities of daily living and in maintaining social functioning, with no episodes at all of decompensation. However, Dr. Lewis found that Plaintiff would be moderately limited in maintaining concentration, persistence or pace. (Tr. 287). Alice Chambly, Psy.D., reviewed and affirmed Dr. Lewis's assessment. (Tr. 304).

In March of 2008, Plaintiff sought emergency room care, was diagnosed with bipolar disorder and assigned a GAF score of 45.[4] (Tr. 17, 390-391). In May of 2008, back on the medications she had been off for several years, she was assigned a GAF score of 80 by psychiatric emergency room personnel (Tr. 17, 378-379). After running out of medication June 2008, emergency room personnel assessed her GAF score at 55. (Tr. 17, 373).

---

[4]The GAF Scale reports an individual's overall level of functioning at a particular time, with higher scores reflecting higher functioning. In general, "[t]he Commissioner 'has declined to endorse the [GAF] score for "use in the Social Security and SSI disability programs," and has indicated that [GAF] scores have no "direct correlation to the severity requirements of the mental disorders listings.'" *DeBoard v. Comm'r of Soc. Sec.*, 211 Fed. App'x 411 (6th Cir.2006)(additional quotations omitted).

Plaintiff began outpatient therapy sessions with a counselor at the Health Resource Center of Cincinnati, Inc. in September 2009.[5]   On October 5, 2009, a therapist diagnosed Plaintiff with bipolar disorder, with a "rule out" of other mood disorder, as well as with a borderline personality disorder, and a GAF score of 53-55. (Tr. 17, 326).  In October 2009 Plaintiff reported that her mood swings had decreased on medication in the past (Tr. 323), and that the same medication (Wellbutrin) was currently helping (Tr. 17, 398).  At a therapy appointment on November 9, 2009, she reported that she went out with her sister and a couple of friends over the weekend and had a good time.[6]  (Tr. 315).

On October 27, 2009, Plaintiff was prescribed Wellbutrin and Trazadone by a physician whose name is illegible in the record.   (Tr. 337).   At a subsequent appointment on November 9, 2009, another physician ordered topomax.   (Tr. 338). Plaintiff thereafter began treating with Bryan Cairns, M.D., who prescribed Wellbutrin, topiramate (topomax), trazedone, and Abilify (arippiprazole) in November and December 2009.  (Tr. 329).  By November 2009, Plaintiff's diagnosis was changed from bipolar to mood disorder, not otherwise specified, and borderline personality disorder; her GAF score was assessed at 55 on November 9, 2009.  (Tr .17, 322).  The same month she indicated her mood was better, she was calmer, and that she had not had any angry outbursts.  (Tr .17, 314, 316).

---

[5] According to its website: "The Health Resource Center of Cincinnati, Inc. serves homeless and at risk individuals who are in need of psychiatric, or social services and whose needs for service are not being met by other agencies." *See*  http://www.hrcci.org/ (accessed on June 5, 2012).

[6] The record is not clear as to whether the "friends" were friends of Plaintiff's sister or Plaintiff's own friends. Plaintiff testified that she has only one female friend with whom she regularly associates, other than the male friend with whom she lives.  (Tr. 53).

On December 14. 2009, when he had seen Plaintiff on only two occasions, Dr. Cairns completed a mental impairment questionnaire concerning the Plaintiff (Tr. 361-66).  Dr. Cairns diagnosed Plaintiff with mood disorder, NOS, and with psychosis, NOS. (Tr. 364).  The mental RFC "check box" form concluded that Plaintiff had only mild limitations in her activities of daily living, but opined that Plaintiff has moderate limitations in maintaining social functioning, and in maintaining concentration, persistence or pace.  (*Id.*).  Dr. Cairns marked "seriously limited, but not precluded" in assessing many of Plaintiff's mental abilities and aptitudes to perform even unskilled work (Tr. 363).  He marked "seriously limited, but not precluded" in assessing Plaintiff's abilities to understand and remember detailed instructions, to carry out detailed instructions, or to set realistic goals or make plans independently as required to perform semiskilled and skilled work.  (*Id.*).  Finally, Dr. Cairns opined that Plaintiff would be "unable to meet competitive standards" in her ability to deal with the stress of any semiskilled or skilled work. (*Id.*).  Dr. Cairns indicated that his prognosis was "guarded" due to his limited interaction with Plaintiff at the time of his evaluation, and noted that he had recently prescribed new and additional psychiatric medications.  Dr. Cairns wrote "unable to determine" in response to a query as to whether Plaintiff was a malingerer, but gave no explanation of that response. (Tr. 365).   He assigned Plaintiff a GAF score of 60.  (Tr. 361).

Plaintiff's primary health care system records reflect missed appointments at Price Hill Clinic in September 2008, April and July 2009, with "no follow-up" noted in her record after July 2009.  (Tr. 400).  Plaintiff reported that she had no regular primary care "for years."  (Tr. 402).

### b. Analysis of Consulting and Treating Physician Opinions

In assessing Plaintiff's mental RFC, the ALJ gave "great weight" to the opinions of non-examining consultant Dr. Lewis, while giving only "some weight" to the opinions of examining and treating physician, Dr. Cairns. (Tr. 21). The ALJ's basis for crediting the opinions of Dr. Lewis over the opinions of Dr. Cairns reflects error.

20 C.F.R. §404.1502 includes as a treating source any psychologist or physician "who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s)." The regulation adds that a medical source "who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year)" may still be considered to be a treating physician "if the nature and frequency of the treatment or evaluation is typical for your condition(s)." *Id.* However, the regulation excludes from the definition of a treating physician anyone whose "relationship...is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability." *Id.*

Notwithstanding the "controlling" weight usually afforded to the opinions of treating physicians, an ALJ may reject the opinions of a treating physician so long as he or she provides "good reasons" for doing so. Thus, "if the treating physician's opinion is not supported by objective medical evidence, the ALJ is entitled to discredit the opinion as long as he sets forth a reasoned basis for his rejection." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *see also* 20 C.F.R. § 404.1527(c)(2). Additionally, regardless of medical opinions on the subject, determination of a claimant's

residual functional capacity is ultimately "reserved to the Commissioner." 20 C.F.R. §404.1527(d)(2). Where conclusions regarding a claimant's functional capacity are not substantiated by objective evidence, the ALJ is not required to credit those conclusions. *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 287 (6th Cir. 1994).

In this case, Plaintiff argues that if the ALJ had given the appropriate "controlling" weight to the opinions of Dr. Cairns, Plaintiff would be deemed to be disabled. In fact, the vocational expert testified that someone who was limited in her RFC in the manner described by Dr. Cairns may not be precluded from all employment "initially," but that "it would be difficult to, to maintain it [employment] over a long period of time." (Tr. 64-65).

Despite stating that she was giving the opinions of Dr. Cairns "some weight," the ALJ rejected nearly all of Dr. Cairns' assessment of Plaintiff's mental limitations. The ALJ reasoned, "[w]hen he completed the questionnaire, Dr. Cairns had only treated the claimant two times *so he is hardly a treating source.*" (Tr. 21, emphasis added). The ALJ further reasoned that Dr. Cairns had just prescribed new psychiatric medications, as to which Dr. Cairns explained that he was "awaiting the claimant's response." The ALJ concluded: "Arguably, the claimant's condition would improve with treatment as the record shows it has in the past." (*Id.*).

The ALJ's stated reasons do not constitute "good reasons" for rejecting Dr. Cairns' opinions. First, the ALJ mistakenly dismissed Dr. Cairns as "hardly a treating source." The record reflects that although Plaintiff had been treated by Dr. Cairns on only two occasions as of December 2009, she had been prescribed psychiatric medications by other physicians at the same clinic on two prior occasions, and had been receiving regularly scheduled therapy for approximately eight sessions with a

counselor at that center for several months.[7] (Tr. 311-340). Dr. Cairns, as the psychiatrist supervising Plaintiff's medications, was privy to all of those records and presumably reviewed them in the course of his treatment of Plaintiff.

Defendant's contention that "the Sixth Circuit has declined to find that an ongoing treatment relationship exists after just two or three examinations," (Doc. 11 at 10), sweeps too broadly. The unpublished cases cited by Defendant are distinguishable. In *Cooper v. Astrue*, 2011 WL 1118514 (S.D. Ohio, R&R filed Jan 25, 2011), for example, the physician saw plaintiff once in 2006, prescribed steroid injections for back pain at a second visit in 2007, and opined that the plaintiff was permanently disabled. However, he reported the following month that Plaintiff had obtained "really good relief" from the injections, and records reflected that plaintiff experienced relief for the next half-year. *Id.*, at *10-11. The magistrate judge noted that "Plaintiff did not have the type of ongoing treatment relationship...that the treating physician doctrine contemplates" at the time the physician rendered his opinion, because the two visits (at the time of his opinion) did not give him the "long term overview" that was necessary. *Id.* In *Boucher v. Apfel*, 238 F.3d 319, 2000 WL 1769520 (6th Cir., Nov. 15, 2000), the ALJ rejected as a treating source a physician whom plaintiff had visited three times in three years, where the visits were solely for the purpose of evaluating his claim for disability benefits

---

[7] A psychotherapist is not considered to be an "acceptable medical source" like a treating physician or doctoral level psychologist; therefore, his or her opinions are not entitled to "controlling weight." *See* 20 C.F.R. §§404.1527(a)(2); 404.1527(c), 416.927(a)(2), 416.927(d). Nevertheless, SSR 06-03p, 2006 WL 2329939, provides that opinions from medical sources who are not "acceptable" medical sources should still be considered under the factors set forth in 20 C.F.R. §404.1527(c)(2), including "how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion." *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007)(citations omitted).

at the request of an agency. There was no dispute that the consulting physician in *Boucher* had no "ongoing treatment relationship" at the time he rendered his opinions.

The number of times a plaintiff has been examined by her physician, prior to the date that physician renders his or her opinion, must be considered in deciding whether the physician has an ongoing treatment relationship, but it is not the sole determining factor under the applicable regulations. Dr. Cairns saw Plaintiff twice within a thirty-day period (Tr. 312-13, 322) and changed her psychiatric medications in the course of what was clearly an ongoing treatment relationship. (Tr. 361). Since most psychiatrists oversee medications as opposed to providing the type of weekly or biweekly psychotherapy provided by a therapist or psychologist, a period of months between such appointments is not uncommon. A prescribing psychiatrist is presumed to intend to continue a treatment relationship to see how the prescribed drugs affect the patient, an intention reflected in Dr. Cairns' notes. Because the records of Dr. Cairns reflect visits with "a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s)," 20 C.F.R. §404.1502, the ALJ should not have implied that he was not a treating physician. *See also generally, Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir.1989) (holding that ALJ erred by discounting one-time psychiatric examination based upon the relative "imprecision of the psychiatric methodology or the absence of substantial documentation." (internal quotation marks and additional citation omitted)).

The additional basis for rejecting Dr. Cairns' opinions - that "[a]rguably, the claimant's condition would improve with treatment as the record shows it has in the past," is also troubling. (Tr. 21). Plaintiff's records do not reflect any substantial mental health treatment for most of her teenage years, and reflect but a few sporadic visits to a

psychiatric emergency room to obtain medications from 2006-2008 before she re-entered treatment soon after reaching adulthood. For the ALJ to conclude that Plaintiff was likely to "improve with treatment" upon Dr. Cairns' newly prescribed drug regimen, based upon limited childhood records and a smattering of emergency room assessments from prior years, required an unwarranted degree of speculation and medical judgment - not the least because no records reflect that Plaintiff has ever demonstrated the ability to maintain a job of any kind.

To be fair, the ALJ also rejected Dr. Cairns' opinions based upon Dr. Cairns' own inconclusiveness concerning whether Plaintiff might improve over time, and whether she was a malingerer. The ALJ also noted that Dr. Cairns' assessment of Plaintiff's overall functioning reflected only a "moderate" range of limitations, and that he (apparently inaccurately) noted episodes of decompensation without specifying any such episodes. (Tr. 21). None of these reasons reflects clear error, but on balance they do not constitute substantial evidence for rejecting Dr. Cairns' opinions given the invalidity of other articulated reasons.

In contrast to the opinions of Dr. Cairns, the ALJ gave the February 12, 2008 opinion of non-examining records reviewer, Dr. Lewis, "great weight." (Tr. 21). The greater weight afforded to Dr. Lewis's assessment reflects additional error. Dr. Lewis relied primarily, if not exclusively, on the one-time examination of Dr. Sexton in January, 2008. (Tr. 270).

In general, the opinions of a consulting physician who has actually examined the plaintiff will be given more weight than that of a non-examining consultant, with treating physicians alone to be given controlling weight. *See* 20 C.F.R. §404.1527(c)(1) and (c)(2). Of course, application of the regulatory scheme permits individual variations in

this general scheme. Thus, in *Blakley v. Commissioner of Social Security*, 581 F.3d 399 (6th Cir. 2009), the Sixth Circuit reiterated the principle that "[i]n appropriate circumstances, opinions from State agency medical...consultants...may be entitled to greater weight than the opinions of treating or examining sources." (*Blakley*, 581 F.3d at 409, quoting Soc. Sec. Rul. 96-6p, 1996 WL 374180, at *3 (July 2, 1996)).

In *Blakley,* the court reversed on grounds that the state non-examining sources did not have the opportunity to review "much of the over 300 pages of medical treatment...by Blakley's treating sources," and the ALJ failed to indicate that he had "at least considered [that] fact before giving greater weight" to the consulting physician's opinions. *Blakley*, 581 F.3d at 409 (*quoting Fisk v. Astrue*, 253 Fed.Appx. 580, 585 (6th Cir. 2007)). Under *Blakley*, then, an ALJ may choose to credit the opinion of even a non-examining consultant who has failed to review a complete record, but she should articulate her reasons for doing so. If she fails to provide sufficient reasons, her opinion still may be affirmed if substantial evidence supports the opinion and any error is deemed to be harmless or *de minimis*. On the facts presented, it was error for the ALJ to give greater weight to the assessment of Dr. Lewis than to the assessment of Dr. Cairns, because the ALJ failed to provide sufficient reasons, and because Dr. Lewis did not review a complete record. The error was not harmless, and therefore requires remand.

Both Dr. Lewis and Dr. Sexton are clinical psychologists. While both psychiatrists and psychologists are qualified medical sources, only treating psychiatrists (like Dr. Cairns) prescribe medications. Dr. Lewis's lack of expertise in assessing the use and efficacy of Plaintiff's psychiatric medications, as a psychologist conducting a records review of a second psychologist, should have been taken into consideration.

After all, the ALJ's non-disability finding was expressly based in part on the perceived likelihood that recently prescribed medications would "improve" Plaintiff's condition to the point that she could maintain employment.

Dr. Cairns, as a treating psychiatrist overseeing those medications, is presumed to have greater knowledge than the non-examining consulting psychologist. Under *Blakley,* it is noteworthy that Dr. Cairns rendered his opinions nearly two years after Dr. Lewis completed her assessment, (Tr. 360), a fact that the ALJ failed to reference.[8] Because the ALJ implied that Dr. Cairns was not a treating source, and because the ALJ improperly weighed the opinions of Dr. Cairns and Dr. Lewis, this case must be remanded.

### 2. The ALJ's Use of the Record

Plaintiff's second and third claims of error are combined for the Court's convenience, as both concern the ALJ's use of the record. In her second claim, Plaintiff contends that the ALJ erred by selectively choosing portions of the evidence that fit her opinions rather than considering the record as a whole. In her third claim, Plaintiff charges that the ALJ failed to provide any support for some of her conclusions.

As an example of cherry-picking portions of a few exhibits, Plaintiff points to the ALJ's reference to an exhibit that assessed Plaintiff at age 6, and again at age 11. The ALJ suggested that Plaintiff's "emotional and behavioral problems were not seriously interfering with her functioning" at that time. (Tr. 15). The ALJ's statement does indeed present a rosier picture of Plaintiff's mental health impairment than may be warranted given the length of intervening years (and totality of the exhibit in question) but standing

---

[8] Presumably Dr. Cairns prescribed new medications in part based upon his observations of new symptoms not found by Dr. Lewis, including psychosis (hearing voices at times, and occasional homicidal and suicidal ideation). (Tr. 312).

alone, it is not clear that the reference to childhood records would warrant remand. Even though the ALJ made other errors that require remand for re-evaluation of Plaintiff's mental RFC, the ALJ later provided some discussion of most of the relevant mental health records, as well as of relevant Social Security statutes and rulings.

An ALJ is not required to discuss every medical record in detail, *see, e.g.*, *Walker v. Sec'y of Health & Human Servs.*, 884 F. 2d 241, 245 (6th Cir. 1989) but should make sure to consider the record as a whole. *See Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978) ("The determination of whether there is substantial evidence to support the findings of the Secretary depends on the record as a whole"). *See also Hurst v. Sec'y of Health & Human Servs.*, 753 F.2d 517, 519 (6th Cir. 1985) (citing *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980)) ("failure to consider the record as a whole undermines the Secretary's conclusion"). Despite the existence of other errors in weighing the opinions of Drs. Cairns and Lewis, Plaintiff points to no particular mental health evidence that was wholly ignored by the ALJ. Finally, there is no question that the ALJ supported her findings concerning Plaintiff's physical RFC with references to the record as a whole.

### 3. The ALJ Improperly Assessed Plaintiff's Credibility

As her last assignment of error, Plaintiff argues that the ALJ improperly evaluated her credibility. An ALJ's credibility assessment must be supported by substantial evidence, but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Further, a credibility determination cannot be disturbed "absent a compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir.

2001). Thus, it is proper for an ALJ to discount the claimant's testimony where there are contradictions among the medical records, her testimony, and other evidence. *Warner v. Comm'r of Soc. Sec.*, 375 F.3d at 387, 392 (6th Cir. 2004).

On remand, the ALJ should re-evaluate the Plaintiff's credibility. The ALJ concluded that "[t]he claimant's functioning, as demonstrated by the medical evidence of record, is significantly better than she has alleged at the hearing. Her allegations of disability are not supported by substantial objective evidence, clinical findings, or treatment history. The undersigned finds such allegations to be disproportionate and less-than-credible." (Tr. 23). The ALJ offered three reasons for negatively assessing Plaintiff's credibility: 1) "significant gaps in claimant's mental health treatment" (Tr. 17); 2) Plaintiff's limited work history; and 3) Plaintiff's ability "to follow rules when she chooses." (Tr. 23). All three reasons reflect unwarranted assumptions, in light of the evidence in the record as a whole.

First, the ALJ found that Plaintiff's treatment history "is not consistent with a finding of disability," because it reflects "conservative care and treatment," and "long periods when she was out of treatment." (Tr. 23). For example, the ALJ found suspicious the fact that "after being off of her medication for four years, the claimant sought to re-establish treatment around March 2008, following her initial denial of disability benefits." (*Id.*). In referencing Plaintiff's history of treatment, however, the ALJ failed to note that most gaps and "conservative" treatment occurred when Plaintiff was a minor child enrolled in foster care. By contrast, Plaintiff consistently sought psychotropic medications through emergency room care soon after turning 18.

As an adult, the record reflects that Plaintiff failed to attend some appointments at the Lower Price Hill clinic for treatment by a primary care physician, which the ALJ

suggested "[m]otivational" and "compliance issues." (Tr. 17). The ALJ also noted that Plaintiff "indicated that her medications were helping" but found fault with Plaintiff for twice running out of her medications without obtaining a timely refill. (*Id.*). Again, however, the record also reflects that Plaintiff has borderline intellectual functioning, and had experienced several changes in residence. She has a severe mental illness, no health insurance or financial resources, and very limited ability to obtain consistent treatment since reaching the age of 18 in 2006. Her attorney represented to the ALJ that once counsel advised Plaintiff of the availability of low-cost and free mental health care, Plaintiff placed her name on waiting lists in order to obtain adequate treatment. (*See* Tr. 330, 402).

Sixth Circuit case law confirms that it is improper to *assume* that a patient's failure to receive mental health treatment evidences a tranquil mental state, particularly since the very failure to seek treatment may be a symptom of the disorder. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283-284 (6th Cir. 2009)(citing *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009)). In addition, the failure to comply with treatment cannot be the determining factor in judging the credibility of a mentally ill claimant. *See Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989). That is not to say that a failure to seek treatment may never be considered. *See Teel v. Comm'r of Soc. Sec.,* 2011 WL 6217424 (S.D. Ohio Dec. 14, 2011)(J., Beckwith, noting lack of mental health treatment can be appropriate factor). However, SSR 96-7p generally requires the adjudicator to consider any reasons offered for a failure to seek treatment, including mental illness or a lack of insurance. *See Green v. Comm'r of Social Sec.,* 2008 WL 4449854 at *9 (E.D. Mich., Oct. 2, 2008); *Blakeman v. Astrue*, 509 F.3d 878, 888 (8th Cir. 2007). While the relative lack of consistent treatment *may* negatively

impact credibility, the ALJ's analysis should have reflected consideration of the reasons for the lack of treatment before drawing such a strong negative inference on the facts presented.

The ALJ additionally faulted Plaintiff for her "very limited work history, which raises some questions about whether the current unemployment is truly the result of a medical problem." (Tr. 23). However, while Plaintiff has never engaged in substantial gainful activity, that fact appears to lend greater support to the premise that Plaintiff is unable to work, than to the premise that she can work, but chooses not to. The record reflects that Plaintiff's only employment was during academic recesses in the summers of 2003 and 2004, at times when she was 15 and 16 years of age. She explained that her limited employment was provided through a structured "CCY" program, and that her foster mother "signed us up for it and everything." (Tr. 50). There is no evidence that Plaintiff has ever found or maintained a job without assistance. (Tr. 49-50, 153-56). In fact, Plaintiff testified that she has difficulty completing any job application due to deficient reading and writing skills. (Tr. 50-51). Thus, it was unreasonable for the ALJ to unequivocally conclude that Plaintiff's lack of work history reflects negatively on her credibility. As with Plaintiff's limited mental health treatment, this Court is not determining that Plaintiff's lack of work history is the result of her impairment, but only that the ALJ's categorical opposite conclusion was unreasonable absent - at a minimum - better evaluation of the medical evidence concerning her work-related limitations.

A third reason cited by the ALJ for her credibility assessment was Plaintiff's ability "to follow rules when she chooses." (Tr. 23). The record cited by the ALJ for this conclusion was a childhood record that the ALJ described as indicating "that she followed rules in her foster home." The particular referenced record does not support

the proposition for which it is cited, nor does the record as a whole suggest that Plaintiff was able to follow rules while in foster care. To the contrary, the limited records available suggest that Plinatiff was hospitalized as a child for assaultive behavior, and that throughout most of her time in foster care, she ran away and was repeatedly removed and placed in new foster homes until reaching the age of 18.

While an ALJ is free to resolve issues of credibility as to lay testimony, or to choose between properly submitted medical opinions, she is not permitted to make her own evaluations of the medical findings. As recognized by this Court, "[t]he ALJ must not substitute his own judgment for a doctor's conclusion without relying on other medical evidence or authority in the record." *Mason v. Comm'r of Soc. Sec.* No. 1:07-cv-51, 2008 WL 1733181, at * 13 (S.D. Ohio April 14, 2008) (Beckwith, J; Hogan, M.J,, citing *Hall v. Celebrezze*, 314 F.2d 686, 690 (6th Cir. 1963)).

Evidence of a plaintiff's activities of daily living may be sufficient, in some cases, to support a negative credibility assessment. Here, Plaintiff is able to do housework, make food for herself, shop for herself, and does not need assistance with personal care. (Tr. 59). She has never had a driver's license (Tr. 35), but can use public transportation. (*Id.*). She lives with a friend who helps support her, but does not always get along with him. She testified that she currently receives food stamps and has a medical card, but also testified that she engages in sex "with people to get money." (Tr. 38, 46, 53-54). In light of the three errors discussed above, the ALJ's assessment of Plaintiff's credibility in this case cannot rest solely upon the Plaintiff's activities. Instead, the ALJ's conclusion that "Plaintiff's allegations of disability are not supported by substantial objective evidence, clinical findings, or treatment history," (Tr. 23) requires further review on remand.

### III. Conclusion and Recommendation

A sentence four remand under 42 U.S.C. § 405(g) provides the required relief in cases where there is insufficient evidence in the record to support the Commissioner's conclusions and further fact-finding is necessary. *See Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 174 (6th Cir. 1994) (citations omitted). In a sentence four remand, the Court makes a final judgment on the Commissioner's decision and "may order the Secretary to consider additional evidence on remand to remedy a defect in the original proceedings, a defect which caused the Secretary's misapplication of the regulations in the first place." *Faucher*, 17 F.3d at 175.

For the reasons explained herein, **IT IS RECOMMENDED THAT**:

1. The decision of the Commissioner to deny Plaintiff SSI benefits be **REVERSED** and this matter be **REMANDED** under sentence four of 42 U.S.C. § 405(g);

2. Consistent with this R&R, the ALJ should reevaluate: a) the weight to be given to each medical opinion; and b) Plaintiff's credibility.

3. As no further matters remain pending for the Court's review, this case be **CLOSED**.


         */s Stephanie K. Bowman*
         Stephanie K. Bowman
         United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

TAIR JONES,                                             Case No. 1:11-cv-228

        Plaintiff,                              Beckwith, J.
                                                       Bowman, M.J.

    v.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.


**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).